U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

Signed July 08, 2011

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MELVIN GENE MORRIS, III and | § | CASE NO. 09-50082-RLJ-7 |
| TRACIE LEIGH MORRIS, | § | |
| | § | |
| DEBTORS | § | |

| | | |
|---|---|---|
| RAKESH SHAH and | § | |
| SHILPA SHAH, | § | |
| | § | |
| PLAINTIFFS | § | |
| | § | |
| VS. | § | ADVERSARY NO. 09-05010 |
| | § | |
| MELVIN GENE MORRIS, III and | § | |
| TRACIE LEIGH MORRIS, | § | |
| | § | |
| DEFENDANTS. | § | |

## MEMORANDUM OPINION

The Court addresses the dischargeability complaint filed by Dr. Rakesh and Shilpa Shah against Chapter 7 debtors, Melvin and Tracie Morris. [Dkt #2]. The Shahs claim they are owed damages in excess of $200,000 arising from Mr. Morris's failure to adequately complete his

obligations under a home construction contract. *Id.* ¶ 16.

On February 4, 2011, the Court entered a partial summary judgment finding there existed no genuine issue of material fact with respect to the Shahs' section 523(a)(4) and (a)(6) claims. [Dkt# 52]. Additionally, the Court granted summary judgment on the section 523(a)(2)(A) claim against Tracie Morris. *Id.* Accordingly, the sole issue remaining is whether a debt owed by Melvin Morris ("Morris") should be excepted from discharge pursuant to section 532(a)(2)(A). Trial was held February 16-18, 2011. After due consideration of the facts and the law, the Court finds any debt owed by Morris to the Shahs is dischargeable.

## Background

In the fall of 2007, the Shahs were contemplating the installation of a swimming pool and other major improvements in their backyard. They were in the process of obtaining an estimate for the pool installation from a pool contractor when the foreman on Morris's landscaping crew recommended the Shahs talk to Morris about the project. The Shahs knew Morris well as his landscaping business had handled their lawn care for several years. Morris presented the Shahs with a digital model of the project and discussed various ideas. He explained he was from a family of carpenters and had experience installing pools. He also promised to do the project "turn key," that is, he would handle all aspects of the Shahs' contemplated renovations. Intrigued by the prospect of having one individual manage the entire project as opposed to hiring numerous contractors, the Shahs met with Morris many times over several weeks discussing and, in effect, negotiating a contract for the project.

Ultimately, the Shahs decided to hire Morris for the job. In November 2007, the parties entered into a preliminary contract for just the pool installation portion as ideas for the remainder

of the project continued to evolve. Pursuant to this initial deal, the Shahs agreed to pay Morris approximately $68,000 for the pool installation, with $23,410 up-front to get installation under way. Though not defined in the agreement, both the Shahs and Morris understood that the pool was to be installed and working by Memorial Day, 2008. Over time the parties refined the terms for the other improvements and, in March of 2008, entered into a final contract for the entire project, incorporating the pool contract. By the contract's terms, the Shahs agreed to pay Morris approximately $167,000 in exchange for the "turn-key" job.

In the end, the Shahs paid Morris $123,565 for what they now claim was a terribly inadequate job. They allege Morris owes them for the substantial expenses incurred repairing defects he left on their property as well as the cost of contracting anew for services he promised but never completed.

Morris, as the debtor in this bankruptcy, seeks to discharge any debt owed the Shahs. The Shahs respond that the bankruptcy system is a privilege and Morris should be precluded from enjoying its benefits because of his dishonesty in dealing with them. Admittedly, the Shahs can point to no explicit misrepresentation that caused them harm. Instead, their theory asks the Court to take a holistic view and find, from circumstantial evidence, proof that Morris never intended to fulfill his obligations under the contract.

In support, the Shahs first point to the numerous construction problems they suffered as evidence that Morris lacked the expertise to get the job done. By all accounts, the construction project did not go as planned. There were countless problems of varying degrees. The following are two of the more noteworthy early hiccups. In anticipation of the Shah project, Morris purchased a piece of equipment called a "skid loader." Somehow, unfortunately, the skid loader

took a dive into the vast hole that awaited the swimming pool. The result was fairly catastrophic as Morris was required to rent a similar piece of equipment for the job, meanwhile spending $10,000 to rebuild the skid loader's motor. A second major problem was a "bad pour." The testimony showed the Shahs spent somewhere in the neighborhood of $7,000 on a door that was to open onto a patio overlooking the backyard. But the patio concrete was poured too high, such that it prevented the door from opening. It had to be ground down to accommodate the door. (Later, a pipe broke under this concrete slab and flooded the Shahs' home). There were problems with other aspects of the project as well. There were issues getting the proper building permits, framing and finishing the pool house, installing the pool cover, pool pump, sport court, retaining wall, and decking. There were problems with the water sitting stagnant in the pool for months (given it was filled but lacked a water pump). There were problems of exposed pipes and plumbing. The "design" of various parts of the project was defective. And in the midst of it all, the grounds were not adequately maintained; trees and other vegetation died. In short, the defects were innumerable, and Morris's workmanship was of inferior quality. The Shahs contend this incompetence was known to Morris at the outset and became ever more apparent as time progressed.

Additionally, the Shahs allege Morris lacked the business strength to perform the services he contracted to complete. As evidence of this, the Shahs point to Morris's financial condition throughout his dealings with them. The Shahs offered bank records that showed Morris incurred significant insufficient funds ("NSF") charges because he routinely overdrew his account.[1] Morris

---

[1] To characterize this practice as "routine" is an understatement. For most of the months of December 2006 through November 2008, Morris, with Happy State Bank's blessing, issued dozens of NSF checks.

sometimes spent money from his business account on personal items. And finally, about a month after he received the initial $23,410 payment from the Shahs, Morris made a down payment on a new truck. Morris's financial weakness, according to the Shahs, proves Morris was simply using their payments to keep his other creditors at bay.

When called to testify about his financial affairs, Morris rebutted the Shahs' contentions to some degree. He acknowledged he was financing his business, in part, through NSF checks (which the bank would cover) and the resulting charges. He explained his business was experiencing "growing pains," and though unorthodox, he had a verbal agreement with the bank that they would honor his checks so long as he made regular payments and was never overdrawn by more than $10,000. A representative of Morris's bank testified this was, indeed, the arrangement. He further explained that he had one general account into which he deposited funds from all of his jobs and drew on when he needed to pay expenses, sometimes including personal expenses. He explained that the truck purchase was necessary because he was spending too much money on truck repairs and needed the truck for the Shahs' project as well as other jobs.

By the summer of 2008, the Shahs were frustrated by the many delays and inadequacies in construction. They reviewed the progress of the project and, on a copy of the contract, assigned a percentage of completion to each aspect of the project. The Shahs later testified they were probably too generous with their estimations, but at the time assessed, they nevertheless estimated that Morris had completed over half of the project. Even so, the work was not commiserate with their payments, so the Shahs withheld all contractual payments due after

June 23, 2008.[2]

In the fall of 2008, Mrs. Shah met with Morris to discuss a plan going forward. At the meeting, Morris and Mrs. Shah verbally modified the contract, whereby he agreed to complete the job at a loss so long as she paid for the costs of materials. In reliance on this new agreement, Morris ordered a pool cover and incurred other expenses. But the damage to the relationship was

---

[2]By June 23, 2008, the Shahs had paid Morris $123,565. By the terms of the contract, payments were to be made in the following amounts and dates:

| Date | Description | Amount |
|---|---|---|
| 11/27/2007 | (pool deposit) | $ 23,410.00 |
| 3/14/2008 | (pool contract signed) | $ 10,000.00 |
| 3/24/2008 | (pool delivery) | $ 23,410.00 |
| 4/7/2008 | | $ 18,300.00 |
| 4/21/2008 | | $ 18,300.00 |
| 5/5/2008 | | $ 18,300.00 |
| 5/19/2008 | | $ 18,300.00 |
| 6/2/2008 | | $ 18,300.00 |
| Completion | | $ 19,324.28 |
| **TOTAL:** | | **$167,644.28** |

The payment schedule was deferred twice. This deferred two of the $18,300 payments and substituted four of the $18,300 payments for five payments of $11,845 each. The final payment, at completion (whenever that occurred), was reduced from $19,324 to $15,000.

The actual payments made were as follows:

| Date | Amount |
|---|---|
| 11/27/2007 | $ 23,410.00 |
| 3/14/2008 | $ 10,000.00 |
| 3/24/2008 | $ 23,410.00 |
| 4/7/2008 | $ 18,300.00 |
| 5/6/2008 | $ 18,300.00 |
| 5/19/2008 | $ 18,300.00 |
| 6/23/2008 | $ 11,845.00 |
| **TOTAL:** | **$ 123,565.00** |

irreparable, because even under the new terms, the Shahs made no further payments.[3]

On November 25, 2008, the Shahs sent a demand letter to Morris. In the letter, they indicated they had paid $123,565 to him thus far but remained dissatisfied in several respects. They indicated their intent to have a new contractor finish construction on the pool pavilion but insisted Morris complete his remaining obligations under the contract.

At some point prior to the New Year, Morris hand-delivered to the Shahs' home an undated written response to the demand letter. In his letter, Morris thanked the Shahs for their patience and admitted for the first time that he underbid the contract. To show he had not misallocated funds, Morris also included receipts for over $100,000 of payments he made to material suppliers and subcontractors concerning the Shahs' project. He testified he actually paid more on the project but could not find all of the receipts to prove it. When Morris delivered the letter, Dr. Shah made a threatening comment or gesture indicating Morris was no longer welcome on the Shahs' property. And thus, any possibility of cooperation between the parties was over. The Shahs eventually completed the project but only after hiring new contractors and incurring significant, additional costs.

**Discussion**

The Shahs' argument against discharge is nuanced. In effect, they claim Morris knew at the outset that he was incapable of completing the job. As proof, they point to his weak financial position—at least given the magnitude of the project. They also submit that the numerous construction mistakes and defects prove he was utterly incompetent—a condition he must have known about from the start. And accordingly, Morris knew from the beginning that he had no

---

[3] The Court is not implying that the Shahs were unjustified in refusing to make further payments. The project was a fiasco from the beginning.

business taking on their project. They argue that Morris's letter admitting he underbid the project is proof of his "mea culpa." Secondarily, the Shahs proffer an argument that even if Morris did not literally intend to defraud the Shahs at the outset, he did as time progressed. In other words, at the instant Morris sensed the project's impending failure, he had a duty to advise the Shahs of same. Any payments made after this point were obtained by fraud, the Shahs contend.

Morris responds that his obligation to the Shahs sounds in contract, not fraud. He admits there were problems with the construction but submits that he made no material misrepresentations to the Shahs. He counters their arguments by first claiming he had no duty to disclose the details of his personal financial affairs and, in any event, was under no financial pressure from his bank or other creditors. He claims he was in fact an experienced and licensed pool installer. The construction problems, according to Morris, resulted from a series of unfortunate accidents, mistakes, and from uncompensated change orders the Shahs insisted upon. He disputes their contention that he, in effect, tricked them into paying him so he could pay his other creditors. He submits he did not intentionally underbid the contract. He asserts he did not realize until late 2008, around the time of his letter, and well after the Shahs had quit making any regular payments, that there was no hope for a successful outcome. Thus, Morris argues the same evidence cited by the Shahs as proving his "mea culpa" in fact proves his good faith. When taken together, Morris contends the evidence simply does not support the Shahs' theory. The Court agrees.

The Bankruptcy Code has long prohibited debtors from discharging liabilities on account of their fraud under a basic policy of affording relief only to an "honest but unfortunate debtor." *Cohen v. De la Cruz*, 523 U.S. 213, 217 (1998). Code section 523(a)(2)(A) embodies this

tradition. *See id.* at 217-18. Section 523(a)(2)(A) provides that an individual is not discharged from any debt for money, property, or services, to the extent it was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . ." *See* 11 U.S.C. § 523(a)(2)(A). For a debt to be nondischargeable under this provision, the creditor must show, by a preponderance of the evidence, that (1) the debtor made a representation, (2) the debtor knew the representation was false, (3) the representation was made with the intent to deceive the creditor, (4) the creditor actually relied on the representation, and (5) the creditor sustained a loss as a proximate result of its reliance. *See In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005).

Case law has evolved to explain that the terms "false pretenses," "false representation," and "actual fraud" are now terms of art. *See In re Mercer*, 246 F.3d 391, 402 (5th Cir. 2001). A misrepresentation need not be spoken; it can arise from conduct or even a failure to disclose. *See id.* at 404; *In re Christian*, 111 B.R. 118, 122 (Bankr. W.D. Tex. 1989). But it must relate to past or current acts. *In re Allison*, 960 F.2d 481, 484 (5th Cir. 1992); *In re Bercier*, 934 F.2d 689, 692 (5th Cir. 1991). A debtor's misrepresentation of future intentions may not constitute a false representation within the meaning of the dischargeability provision unless, when the representation is made, the debtor has no intention of performing as promised. *In re Townsley*, 195 B.R. 54, 61-2 (Bankr. E.D. Tex. 1996). In short, fraud must exist at the debt's inception—a promise to perform acts in the future is not a qualifying misrepresentation merely because the promise is subsequently breached. *In re Allison*, 960 F.2d at 484; *In re Bercier*, 934 F.2d at 692; *In re Hulbert*, 150 B.R. 169, 175 (Bankr. S.D. Tex 1993). Likewise, a mere expression of opinion, expectation, or declaration of intent is not actionable under section 523(a)(2)(A). *In re*

*Townsley*, 195 B.R. at 61.

Debts that satisfy the third element, the scienter requirement, are debts obtained by frauds involving "moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made." *In re Acosta*, 406 F.3d at 372 (citing *In re Martin*, 963 F.2d 809, 813 (5th Cir. 1992)); *In re Allison*, 960 F.2d at 483; *In re Chavez*, 140 B.R. 413, 419-20 (Bankr. W.D. Tex. 1992) ("The debtor must actively operate to deceive and cheat another" and "the money must actually come to the debtor because of the representation."). There must be some proof that the person making the representations knew of their falsity and made them anyway. *In re Townsley*, 195 B.R. at 62. While "an intent to deceive may be inferred from 'reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation' . . . an honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive." *In re Acosta*, 406 F.3d at 372 (citing *In re Norris,* 70 F.3d 27, 30 n.12 (5th Cir. 1995)). Thus, a "dumb but honest" defendant does not have the requisite scienter. *Id*.

Finally, exceptions to discharge are broadly construed in favor of debtors to accommodate the Bankruptcy Code's policy of providing a fresh start to debtors, unhampered by preexisting financial burdens. *In re Rea*, 245 B.R. 77, 84-85 (Bankr. N.D. Tex. 2000) (citing *In re Davis*, 194 F.3d 570, 574 (5th Cir. 1999)).

The Shahs cannot point to any specific spoken misrepresentation by Morris.[4] They instead

---

[4] In the parties' joint pretrial order, the Shahs simply state that Morris's misrepresentations are outlined in paragraphs 1 through 15 of the *Summary of Claims of Plaintiffs*. Paragraphs 1-15 summarize the Shahs' claims and specifically state that there were "ongoing representations of the Defendants" (¶ 4), that Morris admitted that he had "failed" in several respects on the project and had "improperly bid [the] project" (¶ 9), that they had "been deceived by the Defendants who made false representations . . . or otherwise presented a false sense of what the facts and circumstances were . . ." and that there were "continuous and ongoing misrepresentations by the Defendants regarding the progress of the project . . . ." (¶ 13). These charges are conclusory.

look to the overall course of dealing with Morris as effectively creating a misrepresentation with the requisite scienter and reliance (on their part) to justify a fraud finding. The Shahs are asking the Court to find fraud somewhere within the morass of their disaster, which, for the most part, was of Morris's doing. The law requires a more disciplined analysis, however. The Court construes the Shahs' fraud claim to be one that arises from Morris's conduct or from Morris's failure to speak when required by circumstances.

The evidence reveals that Morris had neither the financial capital nor the experience or expertise necessary to tackle the Shahs' project. It does not, however, support a finding that Morris, at the time he entered into the contract, had no intention of performing the contract. Even the Shahs do not question Morris's intent. They instead argue that he was not capable of doing the job—which he must be charged with knowledge of—and that he convinced them that he could, regardless.

The law will support an inference of a representation that one intends to do what he contracts to do but does not, for purposes of section 523(a)(2)(A) of the Bankruptcy Code, sanction an inference that one represents that he *can* or *has the ability* to do the job. *See In re Mercer*, 246 F.3d at 405. In *Mercer*, a credit card case, the court held that a credit card purchase constitutes a representation through conduct of the user's intent to pay the resulting debt, but it does not constitute a representation of the user's ability to pay. Similarly, as with any contract under which a party is to provide certain services, Morris, as the party providing the services, represented that he had the present intent to provide the future services. Morris's "conduct" was not a representation of his ability to perform, however. The *Mercer* court also emphasized that the scienter requirement under section 523(a)(2)(A) requires a finding of "actual" or "positive"

fraud, as opposed to constructive fraud. *Id*. at 407. One's subjective intent *not* to do what he promises to do—to pay the credit card charge as in *Mercer*, or to perform the construction services as Morris agreed here—is typically proved through circumstantial evidence. *Id*. at 408.[5] Use of circumstantial evidence is necessary as one would rarely admit that he had no intention to perform as promised.

Morris is accused of several "bad" acts. Such acts do not, however, either alone or collectively, support a finding that Morris never intended to perform the services called for under the contract. Morris is accused of misleading the Shahs regarding his ability to perform the job. (As addressed above, a representation that one can or has the ability to do the job does not implicate section 523(a)(2)(A).). Specifically of concern is the representation Morris made that he was an experienced builder. There is some discrepancy, however, concerning whether he stated he was a third generation or a fifth generation carpenter. This evidence is inconclusive and, to say the least, inconsequential. Morris advised the Shahs that their project was bigger than any others he had done. The Shahs further contend that Morris fraudulently extracted more payments from them by agreeing to a deferred payment schedule.[6] Such charge is likewise not compelling. After all, payments were deferred—not accelerated.

One of the successor contractors, Tom Linke, accused Morris of "spiking" the project. This is apparently a term used in the construction business to describe a contractor who purposely

---

[5]The *Mercer* court identified various factors to consider in determining whether the use of a credit card was done *without* the intent to pay the resulting debt. Citing other cases, the court identified twelve factors: "the time between card-use and the bankruptcy filing; whether, prior to card-use, an attorney was consulted about bankruptcy; the number of charges; their amount; the debtor's financial condition at card-use; whether the limit was exceeded; whether multiple charges were made on the same day; whether the debtor was employed; her employment prospects; her financial sophistication; whether her buying habits changed suddenly; and whether luxuries or necessities were purchased." *Id*. (internal citations omitted).

[6]*See supra* note 1.

underbids a cost-plus project, does minimal work, thereby "spiking" or marking the project as his. As a result, the contractor traps the owner into paying significantly more than what was contemplated. The Shahs' project was not a cost-plus contract, thus, at least as the Court understands the practice of "spiking," there was no incentive to "spike" the job. Morris had a turn-key deal; he was stuck doing the job for the amount called for under the contract. Besides, the evidence does not support a conclusion that Morris had the intent implied from one "spiking" a job.

More telling of Morris's conduct and intent is the evidence of his overall financial condition and, specifically, his questionable practice (in concert with the bank) of effectively financing his business affairs through the issuance of NSF checks. Such practice cannot, under any credit or business standard, be acceptable. In addition, Morris's inability to specifically account for his use of the payments made to him by the Shahs is troubling. He made a down payment of $5,000 on a new truck shortly after receiving the Shahs' initial $23,410 payment. And, upon questioning, he admitted that he could not, even in a general sense, account for his usage of the Shahs' payment funds. This evidence is countered, however, by the stipulated fact that Morris left no unpaid subcontractors or other major expenses outstanding at the time he left the job. While the contract did not specifically tie payments to progress of the project, it was certainly the Shahs' and Morris's understanding that there was a correlation between the two. This is apparent from a review of the payment terms.[7] While Morris's banking practices and inability to specifically account for the use of the Shahs' payments are problematic and, to some degree, disturbing, they do not sufficiently inform the fraud analysis. They imply at most that Morris had no business

---

[7] *See supra* note 1. In addition, the March contract stated that the parties may "revisit" the payment schedule.

doing the job because he had neither the necessary experience nor financial wherewithal to handle the project. It does not mean he did not intend to perform.

### Conclusion

The evidence simply does not support a finding that Morris made promises to the Shahs that he never intended to keep. In addition, the evidence does not sufficiently support the Shahs' allegations that Morris was using their payments for other unrelated projects. Morris paid over $100,000 to subcontractors and suppliers alone (this does not include the cost of materials taken from his inventory or the cost of his and his employees' labor). Morris received payments of $123,565. The difference is not so great that the Court must conclude it was all a scheme to defraud the Shahs. There have been no mechanic's liens filed against the property. Even Dr. Shah, when asked, testified he did not believe Morris had fraudulent intent. At worse, Morris was incompetent, ill-equipped, and insufficiently capitalized to handle the Shahs' project. And he did partially perform the contract.

The Court certainly sympathizes with the Shahs as they have undoubtedly endured a costly and disappointing experience. It cannot, however, justify a tortured construction of the facts and the law as a means to accord them relief. The hard truth is that the Bankruptcy Code affords debtors a fresh start, except in certain narrow instances. Fraud is one. But fraud must exist at the inception of the debt. A contractor's ineptitude is not the same as his bad faith. Subjective intent is what matters. If the debtor had the intent to complete the project at the time he entered the contract but later breaches the contract, no fraud exists. *In re Hulbert*, 150 B.R. at 175. Here, the Court cannot construe the evidence to conclude that Morris acted in bad faith. The Court will issue its order denying the Shahs' request that their claim against Morris be declared

nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code. Given the Court's decision on the dischargeability issue, it need not address the other matters raised by this adversary proceeding. As stated above, the Court has previously issued summary judgment in favor of Morris's wife, Tracie Morris.

### End of Memorandum Opinion ###